**2016 UT App 160**

## THE UTAH COURT OF APPEALS

KAYLA HUTCHINGS,
Petitioner,

*v.*

LABOR COMMISSION AND WASHINGTON
COUNTY SCHOOL DISTRICT,
Respondents.

Opinion
No. 20150429-CA
Filed July 29, 2016

Original Proceeding in this Court

Robert M. Jensen and Virginius Dabney, Attorneys
for Petitioner

Bret A. Gardner and Kristy L. Bertelsen, Attorneys
for Respondent Washington County School District

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGE
GREGORY K. ORME concurred. SENIOR JUDGE RUSSELL W. BENCH
concurred in the result.[1]

ROTH, Judge:

¶1      Kayla Hutchings seeks review of the Labor Commission's
(the Commission) decision to deny her claim for permanent total
disability. We decline to disturb the Commission's decision.

---

1. Senior Judge Russell W. Bench sat by special assignment as
authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

BACKGROUND

¶2    In August 2008, Hutchings was employed by the Washington County School District as a cafeteria worker. One day in late August, she and a coworker were loading boxes of food into the school's walk-in freezer. After continuously lifting and loading boxes that weighed up to forty pounds for about half an hour, Hutchings and her coworker had to lift a box that weighed approximately eighty pounds onto a shelf in the freezer. When Hutchings pushed the box onto the shelf, she experienced a sudden pain in her back and immediately felt sick to her stomach. Subsequently, Hutchings refrained from tasks that required her to bend and lift.

¶3    Hutchings, however, did not miss any work due to the incident, and she did not immediately seek medical attention for pain that may have resulted from it. Nor did she mention the incident or any back or leg pain during a November 2008 appointment with Dr. Britt, a WorkMed physician, regarding another accident she also suffered while at work—a steam burn on her arm. Instead, Hutchings first reported to a medical professional that she was suffering from low back or radicular leg pain in December 2008 during the course of an annual visit to her primary care physician, Dr. Staheli. Dr. Staheli ordered an MRI of her lumbar spine, which showed that Hutchings suffered from degenerative disc disease on multiple spinal levels as well as other degenerative phenomena in her lower back.

¶4    Shortly after the MRI was completed, the school's principal referred Hutchings to WorkMed for her low back and leg pain. At this second WorkMed appointment, Dr. Britt noted that Hutchings reported "[n]o specific trauma" but indicated that at the first of the school year there was always heavy lifting required; he also noted that Hutchings's pain began around that time and that her pain had "to be work related." He indicated that the pain had worsened within the four weeks preceding the appointment and that she had had no medical treatment for the

problem until her December appointment with Dr. Staheli. Dr. Britt diagnosed Hutchings with lower back pain and a disc extrusion. He referred Hutchings to Dr. Snook, a neurosurgeon, but he otherwise released her back to work with modified duty.

¶5     Dr. Snook diagnosed Hutchings with degenerative disc disease as well as nerve-root compression from a cyst in her lower back. In February 2009, he performed surgery to decompress the affected nerve root. He noted that while there had been "some suggestion" prior to surgery that a herniated disc in Hutchings's lower back was also compressing the nerve root, during surgery he found the disc at issue to be "flat," with no sign that it was compressing on the nerve root. Consequently, he performed no disc surgery.

¶6     While the surgery initially alleviated Hutchings's pain, by June 2009, Hutchings had again seen both Dr. Staheli and Dr. Snook, complaining that her leg and back pain had returned. From this point forward, Hutchings continued to experience lower back and radicular leg pain and she tried many treatments, including epidural shots and electrotherapy. In May 2012, she sought another opinion by Dr. Major, who diagnosed her with a degenerative vertebral condition and joint disease in her lower back, though he was uncertain regarding the exact source of her pain. He opined that Hutchings needed a "2-level spinal fusion" to relieve her symptoms.

¶7     In January 2012, Hutchings filed an application for a hearing with the Commission to determine whether she was entitled to disability compensation due to the accident that occurred at the end of August 2008. After an evidentiary hearing, the administrative law judge (the ALJ) determined in an August 2013 decision that at the time of her accident, Hutchings had been suffering from a preexisting degenerative back condition. The ALJ noted that because of the preexisting condition, Hutchings was required to show not just that the injury "ar[ose] out of and in the course of [her] employment,"

*see* Utah Code Ann. § 34A-2-410 (LexisNexis 2015), but "that the work exertion at the time of the accident was unusual or extraordinary as compared to the exertions of nonemployment life," *see Allen v. Industrial Comm'n*, 729 P.2d 15, 26 (Utah 1986) ("[W]here the claimant suffers from a preexisting condition which contributes to the injury, an unusual or extraordinary exertion is required to prove legal causation."). The ALJ then concluded that Hutchings's exertion was not unusual under the circumstances, and as a result, Hutchings had failed to establish legal causation.

¶8      Hutchings sought review by the Commission of the ALJ's order denying her benefits. The Commission determined that "[w]hile there is evidence of pre-existing degenerative changes in Ms. Hutchings's lumbar spine, the record does not clearly show that she suffered from a pre-existing condition that contributed to her work injury." It therefore concluded that, contrary to the ALJ's determination, "the more stringent standard of legal causation does not apply to Ms. Hutchings's claim." Instead, the Commission determined that under the less stringent standard, legal causation was established by the evidence before the ALJ. The Commission then decided that there was a conflict in the medical opinions over whether her work accident was the *medical* cause of her "current low-back condition" and that the issue of medical causation should be referred to a medical panel. Accordingly, the Commission set aside the ALJ's order and remanded the case "for consideration of the medical cause of Ms. Hutchings's current low-back problems with the participation of an impartial medical panel qualified to assess her condition."

¶9      The ALJ then instructed the medical panel that it was to answer three related questions:

> Is there any medically demonstrable causal connection between [Hutchings's] low back

condition and the industrial accident which occurred in August 2008?

Please state the percentage of whole person impairment, if any, sustained by [Hutchings] as a result of the medical problem caused by the industrial accident.

Please identify any medical or functional capacity limitations which apply to [Hutchings] and specifically indicate[] whether the limitation is a result of injury sustained in the August 2008 industrial accident.

The medical panel ultimately concluded that there was no medically demonstrable causal connection between the August 2008 accident and Hutchings's low back condition, and as a consequence, the accident itself did not result in any impairment or cause any "functional capacity limitations."

¶10 The panel reasoned that Hutchings's history of "four medical encounters for low back pain . . . beginning 20 months before the alleged injury," with the last one "only 20 days prior" to the event itself, indicated "significant lumbar degenerative pathology." Thus, it concluded that, when this chronological history was combined with the results of the December 2008 MRI (which showed significant degenerative conditions "at four levels" of the spine), "it is clear that Mrs. Hutchings'[s] low back condition antedated" the August 2008 industrial accident.

¶11 The panel then explained that "[o]ther historical information" post-dating the August 2008 accident also supported its conclusion. For example, the panel noted, (1) in November 2008, about three months after the accident, Hutchings "was examined and treated by Dr. Britt at WorkMed" for an unrelated workplace injury, but there was "no information relative to [low back or leg pain] recorded during

that visit," and she was "released . . . to regular duty" less than a week later; (2) Hutchings "missed work due to headache[s] since the start of the school year but never from [low back pain] or leg pain"; (3) there was no mention of the August 2008 accident in Dr. Staheli's report of Hutchings's December 2008 annual physical, despite the fact that she complained of low back pain and Dr. Staheli ordered an MRI; and (4) while Dr. Britt recorded in his report of her December 16, 2008, visit to WorkMed that Hutchings "had noted [low back]/leg pain since restarting school," Dr. Britt also recorded that "there was 'no specific trauma'" that explained her symptoms but instead only "a lot of heavy lifting at the 'first of the year.'" The medical panel noted that it found Dr. Snook's surgical findings to be "of interest" where Dr. Snook performed "[n]o disc surgery" because he found a "flat (not bulging) . . . disc with no evidence of encroachment" on the nerve root in Hutchings's lower back that he had earlier diagnosed as compressed and where he did not see the cyst that he considered to be the cause of the nerve-root compression.

¶12  The panel ultimately concluded that "[t]he [medical record] information cited in this comment does not allow the medical panel to find any reasonable demonstrable causal connection between Mrs. Hutchings['s] low back condition and the industrial accident which occurred in August 2008." As a result, the panel also determined that there was no whole-person impairment attributable to the accident and that, although Hutchings had capacity limitations of "Sedentary Physical Demand Characteristic of Work Level," "this is not related to the August 2008 industrial accident."

¶13  Hutchings objected to the medical panel report, but the ALJ found "no basis to require a hearing or disallow the medical panel report" and admitted it into the record. The ALJ then found that the "medical panel opinion [was] persuasive given the [medical panel's] expertise, independence and sound analysis" and that she had "reviewed the medical record and

[found] the panel's analysis consistent with the record and supported by the opinion of Dr. Knoebel."[2] The ALJ determined that "[t]he weight of the evidence presented does not support the Petitioner's position" and concluded that Hutchings had "failed to meet her burden of proof regarding medical causation."

¶14    The Commission affirmed the ALJ's decision and denied Hutchings's request for reconsideration. Hutchings seeks review of these orders.

ISSUES ON APPEAL

¶15    This case concerns medical causation. Hutchings's central claim on appeal is that the Commission's medical causation determination was erroneous. She contends that it was error for the Commission to adopt the medical panel report because the medical panel did not properly apply the medical causation test. In particular, Hutchings asserts that the medical panel failed to consider whether the accident medically caused or aggravated her preexisting low back condition. Instead, she contends, the medical panel "considered only preexisting conditions" as a medical cause and then "stopped" the analysis without considering "the accident as a cause." She also contends that the evidence does not support the medical panel's and the Commission's determination that the accident did not cause or aggravate her low back condition.

---

2. Dr. Knoebel was the independent medical evaluator who examined Hutchings in May 2012, after she had filed her application for a hearing for disability benefits. He ultimately concluded that her low back condition was degenerative and "[n]on-industrial."

ANALYSIS

I. Applicable Law

¶16    Under our Workers' Compensation Act, industrial accidents that aggravate or "light up" a preexisting condition are compensable. *See, e.g.*, *Nyrehn v. Industrial Comm'n*, 800 P.2d 330, 335 (Utah Ct. App. 1990). In order to qualify for compensation, the claimant must demonstrate (1) that the injury occurred "by accident"[3] and (2) that the conditions and activities of the job were the cause of the injury. *See Allen v. Industrial Comm'n*, 729 P.2d 15, 18 (Utah 1986); *see also* Utah Code Ann. § 34A-2-401 (LexisNexis 2015). The key causation question is "whether, given this body and this exertion, the exertion in fact contributed to the injury." *Allen*, 729 P.2d at 24. The answer to this question has two components. The claimant must show that the work exertion was both the legal cause and the medical cause of the injury or disability. *See id.* at 25–27.

¶17    The purpose of legal causation is to determine "what *kind* of exertion satisfies the test of 'arising out of the employment'" by examining the work-related exertion that led to the injury in relation to any "'personal causal contribution'" of the claimant— usually an existing physical condition. *Id.* at 25–26 (emphasis added) (citations omitted). The employer bears the burden of demonstrating the existence of a preexisting condition and that the condition contributed to the injury. *Nyrehn*, 800 P.2d at 334. If the employer does so, "a claimant with a preexisting condition must show that the employment contributed something substantial to increase the risk he already faced in everyday life because of his condition." *Allen*, 729 P.2d at 26. Thus, "where the claimant suffers from a preexisting condition which contributes to the injury, an unusual or extraordinary exertion is required to

---

3. Neither party contests that Hutchings's injury occurred "by accident."

prove legal causation," with the "extra exertion serv[ing] to offset the preexisting condition of the employee as a likely cause of the injury." *Id.* at 25–26. In contrast, "[w]here there is no preexisting condition, a usual or ordinary exertion is sufficient [to establish legal causation]." *Id.* at 26.

¶18    The determination of medical causation may also take into account the role of a preexisting condition in the claimed disability. *See, e.g.*, *Giesbrecht v. Board of Review*, 828 P.2d 544, 547 (Utah Ct. App. 1992) (upholding the Industrial Commission's denial of benefits when the preexisting condition (cancer) was not aggravated by the injury claimed in the case (a bone fracture in the claimant's leg)); *Virgin v. Board of Review*, 803 P.2d 1284, 1287–90 (Utah Ct. App. 1990) (upholding the Industrial Commission's decision to deny benefits where the claimant's preexisting condition was the "sole [medical] cause" of the claimant's disability); *Olsen v. Industrial Comm'n*, 776 P.2d 937, 939–40 (Utah Ct. App. 1989) (declining to disturb the Industrial Commission's adoption of the medical panel's conclusion that claimant's condition was caused by preexisting heart disease), *aff'd*, 797 P.2d 1098 (Utah 1990); *Large v. Industrial Comm'n*, 758 P.2d 954, 957 (Utah Ct. App. 1988) (declining to disturb the Industrial Commission's causation determination where substantial evidence supporting the determination that preexisting conditions, not the claimant's injury, was "the medical cause of [the claimant's] permanent total disability status"). The purpose of the medical causation requirement "is to ensure that there is a medically demonstrable causal link between the [legally sufficient] work-related exertions and the unexpected injuries that resulted from those strains." *Allen*, 729 P.2d at 27; *see also Nyrehn*, 800 P.2d at 334 ("Under the legal [causation] test, the law must define what kind of exertion satisfies the test of 'arising out of the employment' . . . [then] the doctors must say whether the exertion (having been held legally sufficient to support compensation) in fact caused this [injury]." (omission and second and third alterations in original) (citation

and additional internal quotation marks omitted)). To meet the medical causation requirement, the claimant must "prove the disability is medically the result of an exertion or injury that occurred during a work-related activity" by showing through "evidence, opinion, or otherwise that the stress, strain, or exertion required by his or her occupation led to the resulting injury or disability." *Allen*, 729 P.2d at 27; *accord Cook v. Labor Comm'n*, 2013 UT App 286, ¶ 12, 317 P.3d 464. In this regard, a claimant attempting to show that the work-related exertion aggravated a preexisting condition "must prove the subsequent disability is medically the result of an exertion or injury that occurred during a work-related activity, and not solely the result of a pre-existing condition." *Virgin*, 803 P.2d at 1288 (citation and internal quotation marks omitted). If the claimant cannot do so, then "compensation should be denied." *Allen*, 729 P.2d at 27. Furthermore, because medical causation is often dependent upon interpretation of relevant medical records and specialized examination of the claimant, our supreme court has observed that "[i]t is through the expertise of the medical panel that the [Industrial] Commission should be able to make the determination of whether the injury sustained by a claimant is causally connected or contributed to by the claimant's employment." *Id.* (citation and internal quotation marks omitted).

¶19 In *Virgin v. Board of Review*, 803 P.2d 1284 (Utah Ct. App. 1990), the claimant suffered an industrial accident where he was hit by a piece of equipment on his left hip and knocked down. *Id.* at 1285. Three days after the accident, he was examined by a physician's assistant who only "found bruising and tenderness in the left hip area, but no fractures." *Id.* The claimant "made no claim for compensation at that time and did not miss any work as a result of" the accident. *Id.* About twenty months later, the claimant underwent a total hip replacement and submitted a claim for medical expenses and disability related to the surgery, "claiming his hip replacement surgery was caused in part by his

. . . industrial accident." *Id.* at 1286. The medical panel explained that "*perhaps* the surgery happened sooner than it would have without the industrial accident," but it ultimately concluded that the claimant's need for hip surgery and subsequent disability "were not caused by the industrial injury." *Id.* at 1289. We upheld the Industrial Commission's decision to deny benefits because the medical evidence permitted only speculation that the accident hastened the surgery and there was no other evidence that the claimed impairment was attributable to the industrial accident. *Id.* at 1289–90. Rather, there was substantial evidence supporting the Industrial Commission's determination that a medical condition that both predated and had no relation to the accident necessitated the hip replacement. *Id*. Thus, the disability for which the claimant sought compensation—his hip replacement—was not the medical result of the workplace accident because the claimant "would have needed the surgery in any event" due to his preexisting condition. *Id.* Accordingly, the claimant failed to demonstrate that his hip replacement was attributable to the industrial accident. *Id.*

¶20　In sum, the role of a preexisting condition in the determination of legal causation is different from the role such a condition plays in the determination of medical causation. Once a preexisting condition is identified, the legal causation question depends on whether the work-related exertion was no more than the physical stresses encountered in ordinary life. Medical causation, then, depends on whether a preexisting condition actually caused or aggravated the specific injury or disability for which compensation is sought.

¶21　Here, Hutchings sought compensation for the economic consequences of her current low back condition. To be entitled to compensation, she was therefore required to demonstrate by a preponderance of the evidence that the conditions and activities she experienced at work in August 2008 were both the legal and the medical cause of her current low back condition. The Commission determined that she met the test for legal causation

because the accident was of a kind that could result in compensable injury for her back problems even in the face of a potentially related preexisting condition, and Hutchings does not challenge that determination on appeal. Thus, Hutchings must now demonstrate that the Commission's conclusion that she had not established medical causation—that the accident caused or aggravated the specific disability for which she seeks compensation (her low back condition)—was based on an incorrect legal premise or that it was not supported by substantial evidence in the record. *See Oliver v. Labor Comm'n*, 2015 UT App 225, ¶ 8, 359 P.3d 684 (explaining that we review "the Commission's application and interpretation of law for correctness" and that "we will not disturb factual findings unless [the petitioner] demonstrates that a finding is not supported by substantial evidence"), *cert. granted*, 366 P.3d 1213 (Utah Oct. 27, 2015) (No. 20150889). Hutchings has effectively conceded that she was suffering from a degenerative spinal condition at the time of her accident by arguing that the accident aggravated this condition. Thus, in order to demonstrate medical causation, she must show that the Commission erred in concluding that preexisting degenerative changes were the sole medical cause of her current low back condition. *See Virgin*, 803 P.2d at 1288.

## II. The Determination of Medical Causation in the Present Case

¶22   Hutchings argues that the medical panel failed to properly analyze medical causation and that the Commission's subsequent adoption of the report perpetuated the error. She contends that it is clear the medical panel considered only her preexisting condition as a medical cause of her disability and did not consider whether the accident aggravated or contributed to the conditions for which she seeks compensation. As proof, she points to the instructions given to the medical panel, the medical panel's reasoning, and certain medical evidence.

¶23   Medical causation is fundamentally a factual determination. *See Chase v. Industrial Comm'n*, 872 P.2d 475, 479

(Utah Ct. App. 1994). "We will not disturb the Commission's factual findings unless the party challenging the findings demonstrates that a finding is not supported by substantial evidence." *Swift Transp. v. Labor Comm'n*, 2014 UT App 104, ¶ 8, 326 P.3d 678. The Commission is the ultimate finder of fact, even if "a medical panel is convened." *Danny's Drywall v. Labor Comm'n*, 2014 UT App 277, ¶ 14, 339 P.3d 624 (explaining that "[t]he role of the Medical Panel is to evaluat[e] medical evidence and advis[e] an administrative law judge with respect to the administrative law judge's ultimate fact-finding responsibility" but that the Commission "is always the ultimate fact finder" and "is not bound by the panel's report" (alterations in original) (citations and internal quotation marks omitted)). The Commission is neither bound to adopt the medical panel's report, nor is it obligated to base its findings and decisions on the report. *Id.* And while "[i]t is not unusual for . . . the Commission to adopt the findings of a medical panel," the Commission's "prerogative and duty . . . [is] to consider not only the report of the medical panel, but also all of the other evidence and to draw whatever inferences and deductions fairly and reasonably could be derived therefrom." *Id.* (first alteration in original) (citations and internal quotation marks omitted). Indeed, the Utah Supreme Court has stated that the medical panel's "proper purpose is limited to medical examination and diagnosis, the evidence of which is to be considered by the [Industrial] Commission in arriving at its decision." *Jensen v. United States Fuel Co.*, 424 P.2d 440, 442 (Utah 1967).

¶24 However, whether the Commission has applied the correct legal standard in reaching its medical causation finding is a legal question, which we review for correctness. *See Provo City v. Labor Comm'n*, 2015 UT 32, ¶ 17, 345 P.3d 1242 (stating that "[f]or appeals from administrative decisions," "we review the law applied to [the] facts for correctness"). As discussed below, we conclude that both the medical panel and the Commission

properly considered whether the industrial accident aggravated Hutchings's preexisting condition.

A.     The ALJ's Instructions to the Medical Panel

¶25     Hutchings claims that the medical panel was improperly instructed regarding the medical causation test, and, in particular, that the Commission failed to ensure that the medical panel was aware of and applied the aggravation rule. Medical panel instructions generally do not provide a basis for an appellate court to disturb the Commission's findings. *See Johnston v. Labor Comm'n*, 2013 UT App 179, ¶¶ 23–25, 307 P.3d 615. In *Johnston*, the claimant argued the same legal error that Hutchings argues here—that the medical panel was not aware of the aggravation rule and instead "employed some other method for determining medical causation." *Id*. ¶ 24. However, we concluded in *Johnston* that the medical panel's "understanding of the aggravation rule is not binding on the [Commission]" because the Commission, not the medical panel, makes the ultimate medical causation determination. *Id.* We observed that "medical panels [are] comprised of individuals without legal training" and that the "medical panel . . . is not the finder of fact and does not make a final and binding [legal] determination." *Id.* Rather, the Commission is the ultimate fact finder, and it is "not bound by the opinions contained in the medical panel's report." *Id.* ¶ 23. As a result, we reasoned that even if the medical panel was unaware of the legal rules related to medical causation or "employed some other method for determining medical causation," that would not provide a basis for convening a hearing regarding the medical panel report or for disturbing the Commission's factual findings. *See id.* ¶¶ 23–25. It was therefore not an error for the Commission to decline the petitioner's request to hold a hearing to inquire into the medical panel's understanding of the aggravation rule. *Id.* ¶ 25. Likewise, even assuming that Hutchings is correct that the medical panel was incorrectly instructed regarding the medical causation test, "the medical panel's possible misunderstanding of the aggravation

rule" is not a basis on which we will disturb the Commission's medical causation determination, absent a showing that the Commission embraced the same misunderstanding. *See id.* ¶ 24.

¶26 Here, we conclude that the questions the ALJ gave the panel neither distorted the medical causation test nor neglected the concept of aggravation; rather, the questions required the panel to consider whether the accident contributed to Hutchings's current low back condition in any degree. The first question posed to the panel was nearly verbatim the medical causation test articulated in *Allen v. Industrial Commission*, 729 P.2d 15 (Utah 1986). *See id.* at 27 ("The purpose of the medical cause test is to ensure that there is a medically demonstrable causal link between the work-related exertions and the unexpected injuries that result from those strains."). And the second and third questions required the panel to consider whether any "percentage of [Hutchings's] whole person impairment" or "medical or functional capacity limitations" was caused by the accident. These questions directed the panel to consider whether the accident caused any portion of the low back condition for which Hutchings sought compensation. As a result, we cannot agree with Hutchings's assertion that the medical panel was incorrectly instructed regarding the medical causation test.

B.    The Medical Panel's and the Commission's Medical Causation Analyses

¶27 We also conclude that the Commission's medical causation determination was based on an appropriate analysis of the facts and applicable law. Hutchings contends that neither the medical panel nor the Commission considered the accident as a medical cause of her low back condition. But it is clear from the record that both the medical panel and the Commission determined that Hutchings's low back condition was the sole medical result of a preexisting condition by appropriately considering the entire medical history in relation to the accident.

*Cf. Resort Retainers v. Labor Comm'n*, 2010 UT App 229, ¶ 29, 238 P.3d 1081 (concluding that the Commission properly adopted the medical panel's report, in part because the Commission "considered the evidence, which included reports in conflict with the medical panel's recommendations, before it adopted the findings of the medical panel" and that the medical panel "similarly considered all of the evidence").

¶28 First, the medical panel made its causation findings after examining Hutchings and conducting an extensive review of her medical history. Indeed, six out of ten pages of the medical panel's report are an exhaustive recitation of the medical history related to Hutchings's low back condition, beginning in December 2006 with her first low back pain appointment with Dr. Staheli and ending with Dr. Major's assessment in 2012. Further, the medical panel analyzed Hutchings's back condition in the context of her medical history as a whole and based its medical causation conclusions on specific evidence in the medical record. For example, in response to the ALJ's question of whether there was a medically demonstrable causal connection between Hutchings's low back condition and her accident, the medical panel referenced Hutchings's reports of low back pain before her accident, the MRI studies, Dr. Staheli's and Dr. Britt's medical reports, the events between the accident and Hutchings's December 2008 appointment with Dr. Staheli in which she first reported low back pain to a medical provider, and Dr. Snook's surgical findings. Based on this history, the panel determined that "the [medical record] information . . . does not allow the medical panel to find any reasonable demonstrable causal connection between Mrs. Hutchings['s] low back condition and the industrial accident which occurred in August 2008."

¶29 The ALJ then determined that Hutchings had "failed to meet her burden of proof regarding medical causation" because she had "reviewed the medical record and [found] the panel's analysis consistent with the record and supported by the opinion

of Dr. Knoebel." The Commission's own assessment of the medical record also tracked the medical panel's medical causation opinion and appropriately adopted the medical panel's reasoning. *See id.* (determining that it was proper for the Commission to adopt the medical panel report where the Commission "considered all the evidence, as it is required to do, and ultimately found that the medical panel's opinions were . . . persuasive" (footnote omitted)). The Commission determined that "[a]fter reviewing the medical evidence and the medical panel's report," Hutchings's "low-back condition was not medically caused by the work accident." In making this determination, the Commission extensively reviewed Hutchings's medical history as well as the medical panel's findings and analysis. In particular, it described the evidence it found in the record to be supportive of the medical panel's conclusions. For example, the Commission noted that the imaging studies the panel relied on "revealed longstanding degenerative changes in [Hutchings's] low back"; that the panel's reasoning was "supported by the findings of Dr. Snook, who also assessed Ms. Hutchings with degeneration in her lumbar spine and confirmed such degeneration postoperatively"; that "Dr. Snook's findings of only degenerative changes rather than an acute injury appear to contradict Dr. Staheli's [initial] diagnosis of a 'herniated lumbar disk'"; that Dr. Staheli later assessed Hutchings with "degenerative disc disease, arthritis and a lumbar-spine cyst"; and that "Dr. Knoebel opined that Ms. Hutchings's low-back problems are due to pre-existing degeneration." Based on this evidence, the Commission concluded that the record supported the medical panel's determination that Hutchings's low back condition was "due to pre-existing degeneration" and that the panel had "appropriately addressed the medical aspects of the claim including the central issue of medical causation." Under the circumstances, it is apparent that both the medical panel and the Commission assessed the medical evidence in the record to determine whether the accident medically caused Hutchings's current low

back condition. Accordingly, we are not persuaded by Hutchings's argument that the Commission improperly applied or analyzed the medical causation test.

C.     Substantial Evidence Supporting the Commission's Medical Causation Finding

¶30     Hutchings next contends that the evidence does not support the medical panel's or the Commission's medical causation determinations. In particular, she contends that the evidence supports her claim that the accident aggravated her preexisting, asymptomatic low back condition. The Commission's medical causation finding is entitled to "substantial deference" so long as it is supported by substantial evidence. *See Danny's Drywall v. Labor Comm'n*, 2014 UT App 277, ¶ 11, 339 P.3d 624. "Substantial evidence is more than a mere scintilla of evidence . . . though something less than the weight of the evidence," and the substantial evidence test is met "when a reasonable mind might accept as adequate the evidence supporting the decision." *See Cook v. Labor Comm'n*, 2013 UT App 286, ¶ 14, 317 P.3d 464 (omission in original) (citations and internal quotation marks omitted). We will not "reweigh the evidence and independently choose which inferences we find to be most reasonable"; rather, we defer to the Commission's findings "when reasonably conflicting views arise," as it is the Commission's "province to draw the inferences and resolve these conflicts." *Danny's Drywall*, 2014 UT App 277, ¶ 11 (citations and internal quotation marks omitted). "In other words, we will not overturn [the Commission's] factual findings if they are based on substantial evidence, even if another conclusion from the evidence is permissible." *Allied Constr. & Dev., Inc. v. Labor Comm'n Appeals Bd.*, 2013 UT App 224, ¶ 2, 310 P.3d 1230 (citation and internal quotation marks omitted). But rather than demonstrate that there is no substantial evidence to support the Commission's decision, Hutchings focuses on evidence in the record that she contends requires a different

conclusion—that the accident aggravated her preexisting low back condition.

¶31    According to Hutchings, the evidence shows that at the time of the August 2008 accident she immediately suffered new and unprecedented back pain and radicular pain; she then experienced ongoing mobility limitations and needed staff assistance to do her work; and she eventually underwent spinal surgery and other treatment. This sequence of events, she argues, conclusively establishes that the accident caused her disability. She also directs us to medical reports that she claims correctly considered the aggravation rule and, as a result, concluded that the accident aggravated whatever preexisting condition contributed to her pain and need for surgery. But this evidence does not require a conclusion that the Commission's decision is unsustainable. Hutchings must do more than point us to facts or pieces of evidence that she contends support her arguments on appeal. *See Carbon County v. Department of Workforce Servs.*, 2012 UT App 4, ¶¶ 5, 8, 269 P.3d 969. Instead, Hutchings must demonstrate that the Commission's medical causation finding itself is not supported by substantial evidence. *See Danny's Drywall*, 2014 UT App 277, ¶ 11. And there is substantial evidence in the record that conflicts with Hutchings's view and from which the Commission could reasonably have found that Hutchings's low back condition resulted entirely from degenerative changes and not from acute injury.

¶32    To begin with, the medical panel's report alone provides substantial evidence to support the Commission's medical causation determination. *See Cook*, 2013 UT App 286, ¶¶ 14–20 (concluding that the medical panel report constituted substantial evidence to support the Board's finding that there was no medical causation where the panel report was thorough and the conclusion was explained by reference to the factual findings from the evidentiary hearing, the claimant's medical history, and "relevant medical literature"). The ALJ and the Commission noted that the medical panel in this case was comprised of two

doctors who were both orthopedic surgeons, diplomates of the American Board of Orthopedic Surgery, and licensed to practice medicine in Utah. Further, the medical panel report noted that "[b]oth physicians met, interviewed, and examined" Hutchings after which they conferred and reached unanimous conclusions in their report. And, as discussed above, it is clear that the medical panel reached its findings and conclusions only after examining Hutchings and exhaustively reviewing her medical history. Further, as discussed below, the medical panel's ultimate conclusion—that Hutchings's low back condition is the medical result of continuing degenerative changes that predated her accident—is corroborated by the evidence it referenced. As a result, the medical panel's report constitutes substantial evidence in its own right.

¶33    Moreover, with respect to the medical record as a whole, the Commission noted that there was evidence that undermined Hutchings's claim that the August 2008 accident caused or aggravated her preexisting low back condition, a conclusion implicit in the medical panel's analysis. For example, the record demonstrates that Hutchings did not miss work due to her low back pain, that she had previously managed her low back pain with medication, and that she did not mention her low back pain to Dr. Britt during an evaluation for a different work injury in November 2008. And when she was finally seen by Dr. Britt in December 2008 for low back pain, he noted that there had been no specific trauma—rather, he noted that the first of the school year always involved heavy lifting—and that Hutchings's pain had only worsened in the prior few weeks.

¶34    Indeed, multiple doctors diagnosed her low back condition as degenerative. For example, Hutchings's surgeon, Dr. Snook, assessed her with spinal degeneration on multiple vertebral levels and a degenerative cyst. Her primary care physician, Dr. Staheli, later assessed her with degenerative disc disease, arthritis, and a spinal cyst. Dr. Major diagnosed her with a degenerative vertebral condition and joint disease.

Dr. Knoebel, after examining Hutchings and reviewing the medical records, noted that the findings in the record indicated that Hutchings suffered from a "degenerative low back condition" that was not reasonably probable to have been "secondary" to the "lifting incident." And the medical panel, also after examining Hutchings and reviewing her medical history and the imaging studies, concluded that Hutchings was suffering from multiple degenerative spinal conditions.

¶35 Further, it does not appear that any medical report in the record characterized any particular spinal condition from which Hutchings was suffering—whether bulging discs or some other condition—as evidence that Hutchings had suffered an acute trauma or injury from her accident. While several medical reports noted Hutchings's accident as part of her history, no report linked that accident with a specific spinal condition. Indeed, the closest a report came to doing so was Dr. Britt's assessment in December 2008 that Hutchings had a "blown disc" in her lower back that had "to be work related." But even this statement was qualified by other statements in the same report that indicated that there was "[n]o specific trauma," indicated that the pain had only worsened in the preceding four weeks, and attributed the blown disc to exertions during the "[first] of the year [when Hutchings] always has to do a lot of heavy lifting." Thus, the medical record contains substantial evidence that, whatever pain or injury Hutchings may have suffered from the accident, the disability underlying her compensation claim resulted from degenerative spinal conditions, not the accident itself.

¶36 To be sure, as Hutchings has pointed out, there is also conflicting medical evidence that the accident aggravated or medically affected her preexisting low back condition, not least Hutchings's own description of the accident and its aftermath. But it is the Commission's prerogative to resolve the conflicts in the evidence, and it did so. *See Cook v. Labor Comm'n*, 2013 UT App 286, ¶ 20, 317 P.3d 464. For example, Hutchings points to

the MRI studies as well as the reports of Dr. Major and Dr. Staheli as evidence that the accident aggravated her low back condition. But the Commission found that the "imaging studies on Ms. Hutchings's lumbar spine . . . revealed longstanding degenerative changes in her low back rather than an acute injury," and the evidence supports this finding. While the December 2008 MRI studies suggested that Hutchings's pain could have been due to a herniated disc that was compressing on a nerve in her lower back, those studies also indicated that she was suffering from degenerative disc disease on multiple levels as well as several other spinal conditions that, as the medical panel found, were unlikely products of her accident. Further, as the Commission noted, the suggestion of a herniated disc in the 2008 MRI studies was directly refuted by Dr. Snook's surgical report in February 2009. Dr. Snook indicated that he did not perform any disc surgery because during surgery he discovered that, despite the suggestion in the MRI studies, the disc at issue was not compressing a nerve root in Hutchings's lower back. Instead, his pre- and postoperative diagnosis was that Hutchings was suffering from a degenerative spinal condition and a cyst "encroaching on [a] nerve" in her lower back. His later reports indicate that he explained to Hutchings that it was unlikely the cyst was caused by her work.[4]

---

4. Hutchings characterizes Dr. Snook's surgical report as describing a flat disc only after he performed the surgery to decompress her nerve, suggesting that it was the surgery itself that flattened the disc. However, Dr. Snook's report more reasonably supports a conclusion that he did not perform any disc-related procedures because he discovered after the surgery began that the disc was already "flat." He stated that "[t]here was some suggestion" of a herniated disc in Hutchings's lower back but further noted that he "did not see any evidence of that at the time of surgery."

¶37    In addition, Hutchings points out that Dr. Major indicated that a definite percentage of Hutchings's body impairment and her low back condition were related to her work injury and that Dr. Staheli opined that Hutchings's "physical and/or mental limitations were . . . in whole or in part caused, aggravated or accelerated by and [were] a direct result of [Hutchings's] industrial injury." But, even if there are medical reports in the record that support a conclusion that Hutchings's low back condition was aggravated by her accident, we will not disturb the Commission's finding where there is other substantial evidence in the record to support the Commission's determination that Hutchings's low back condition is not the medical result of her industrial accident. *Id.* ("It is the [Commission's] responsibility to resolve conflicts in the evidence that come before it."). It is also the Commission's prerogative to weigh the evidence and to rely on the evidence that it considers most credible. *See id.* ("[The Commission] may choose to give certain evidence more weight than other evidence." (citation and internal quotation marks omitted)). And here, the Commission relied on the medical panel report and several individual doctors' reports, as well as Dr. Knoebel's evaluation, to ultimately determine that Hutchings's low back condition was not medically caused by her accident. Although the Commission might have reached a different decision based on the evidence, we will not disturb the Commission's determination merely because "another [determination] from the evidence is permissible." *Green v. Labor Comm'n*, 2013 UT App 165, ¶ 3, 306 P.3d 824 (citation and internal quotation marks omitted).

¶38    Thus, we conclude that while the accident itself might have been the legal cause of some harm or injury to Hutchings, the Commission's decision that the disability for which she has claimed compensation was not medically caused by the accident is supported by substantial evidence in the whole record,

including the medical panel's assessment.[5] Accordingly, we decline to disturb the Commission's medical causation determination.

CONCLUSION

¶39 Hutchings has failed to demonstrate that the Commission incorrectly applied the medical causation test or that the Commission's medical causation determination was not supported by substantial evidence. For these reasons, we decline to disturb the Commission's order.

_____

5. Because we conclude that there was substantial evidence supporting the Commission's medical causation determination, we decline to address Hutchings's argument that there was not sufficient evidence for the medical panel (and, later, the Commission) to conclude that she was suffering from chronic low back pain before her accident. Furthermore, nothing in the Commission's own medical causation determination suggests that it primarily relied on a finding that Hutchings had suffered from chronic low back pain at the time of her accident. Indeed, the Commission specifically noted in its order affirming the ALJ's decision that even if Dr. Staheli's multiple references to low back pain before her accident were mistaken, those references "are not the only evidence relied upon by the medical panel."