2025 UT App 191

## THE UTAH COURT OF APPEALS

BRINKS GLOBAL SERVICES AND ARCH INSURANCE COMPANY,
Petitioners,
*v.*
LABOR COMMISSION AND JAMES BEATY,
Respondents.

Opinion
No. 20240823-CA
Filed December 26, 2025

Original Proceeding in this Court

Brad J. Miller, Attorney for Petitioners

Phillip B. Shell, Attorney for Respondent James Beaty

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1 James Beaty, a truck driver, was injured on the job when his truck was involved in an accident. Beaty filed a claim for—and was eventually awarded—workers' compensation benefits, including reimbursement for the cost of a lumbar spine surgery. His employer, Brinks Global Services (Brinks), and its insurer (collectively, the Company) challenge the award for the lumbar spine surgery, asserting that the evidence presented does not sufficiently support it. We decline to disturb the award.

## BACKGROUND

¶2 In March 2020, Beaty was working for Brinks as a truck driver. On the day in question, as he was asleep in the cabin of the truck while his co-driver was driving, the truck was involved in an accident. The impact threw Beaty to the back of the cabin and

then forward, causing him to land on the floor. Beaty was transported by ambulance to a hospital, where he was treated for injuries to his lower back, right leg, abdomen, arm, and shoulder.

¶3      A few days after the accident, Beaty was treated for lower-back pain, among other things, and he was released to work with restrictions. A week later, Beaty underwent an MRI scan, which showed signs of a lumbar spine injury.

¶4      In May 2020, a doctor (Treating Physician) evaluated Beaty and reviewed the MRI results, and he concluded that Beaty had "disc disease" in his lower back and "may well require surgical treatment," but he opined that Beaty was "presently . . . not a surgical candidate due to his weight." Treating Physician referred Beaty to another doctor, who administered steroid injections to address Beaty's lower-back pain. Later that year, in August, Treating Physician noted that Beaty had a "documented work injury" and determined that Beaty would "require" surgical intervention for his lower back in order to obtain "satisfactory long-term relief." Over the next several months, Beaty received additional lower-back injections and attempted to reduce his weight to qualify for the recommended surgery. These steps, however, were unsuccessful.

¶5      After another round of lower-back injections, Treating Physician noted in December 2020 that the injections had "helped with [Beaty's] back pain somewhat, although he continue[d]" to have symptoms in his lower extremities. About a month later, a physician assistant noted "an 80% decrease in [Beaty's] lumbar pain" but also noted "persisting . . . lower extremity pain." Even so, by January 2021, a different physician assistant (Physician Assistant) noted that either "surgical intervention" or additional MRI imaging was necessary on Beaty's lumbar spine in order to determine the extent of the damage from the work accident.

¶6      In February 2021, a physical therapist evaluated Beaty for functional capacity regarding his work duties. During the

evaluation, Beaty was able to lift thirty pounds from waist to shoulder height, but he was unable to do so from floor to waist height and could not pull a pallet with a 2,000-pound load the length of a fifty-three-foot trailer more than three times, a normal requirement for his job. The physical therapist concluded that Beaty was unable to safely perform the essential duties of his job but that he could return to light-duty work.

¶7      In July 2021, Beaty underwent gastric bypass surgery to help reduce his weight and become a better candidate for lumbar spine surgery. Later that year, in October, Beaty "pull[ed] something in his back" during an incident at his home. Physician Assistant documented this incident when, soon thereafter, Beaty received treatment for pain and requested a specific pain reliever.

¶8      By November 2021, Beaty's body mass index was "within range" to proceed with lumbar spine surgery. The next month, Beaty had a consultation with a surgeon (Surgeon), who recommended surgery—specifically, a microdiscectomy—on Beaty's lower back. This surgery was performed in January 2022 and is the lumbar spine surgery at issue in this case. By May of that year, Beaty's performance evaluation showed that he was able to perform the essential duties of his job and that he was able to return to work without restrictions.

¶9      At various points during Beaty's treatment, the Company retained medical consultants to perform their own evaluations of Beaty's condition. In March 2021, a doctor (Defense Expert 1) evaluated Beaty's lower back and determined that the "work injury [was] not a contributing cause to the current diagnosis" and that Beaty's lower-back condition was "pre-existing in nature and due to the chronic degenerative changes in his lumbar spine." Defense Expert 1 concluded that Beaty "was medically stationary as of June 16, 2020," and that he did "not require medical maintenance with respect to the industrial injury."

¶10 However, another doctor retained by the Company in April 2022 (Defense Expert 2) examined Beaty and opined as follows: "I do feel the medical evidence supports that [Beaty] had a work-related aggravation of his [pre-existing lower-back condition]." And he further stated, "I do feel that the discectomy . . . performed by [Surgeon] . . . was likely due to the effects of his work injury."

¶11 Beaty filed an application for a hearing with the Utah Labor Commission, claiming entitlement to workers' compensation benefits in connection with his work incident and injury. The case was assigned to an administrative law judge (the ALJ), who referred the medical aspects of Beaty's claim to a medical panel. That panel—which at the outset did not include an orthopedic surgeon—initially concluded that Beaty's industrial injuries became medically stable by December 31, 2020.

¶12 Beaty filed an objection to the medical panel's report, claiming that the panel should have included an orthopedic surgeon. The ALJ agreed and requested a new report from a modified medical panel that included an orthopedic surgeon. The modified panel reviewed the records and concluded again that Beaty's industrial injuries became medically stable by December 31, 2020. According to the panel, Beaty had received complete treatment for his work-related injuries by that date; in particular, the panel opined that the lumbar spine surgery that followed was not medically necessary to treat his work injury.

¶13 Beaty objected to this report also, arguing that his condition had not stabilized before his lumbar spine surgery in January 2022. Sustaining Beaty's objection in part, the ALJ then sent additional questions to the medical panel, asking (among other questions) whether the accident aggravated Beaty's pre-existing condition to any degree, when Beaty returned to his "pre-accident baseline," and when Beaty "reach[ed] medical stability for his lumbar condition." The medical panel responded in a written addendum, this time clarifying that the "accident

aggravated [Beaty's] pre-existing lumbar condition" but that Beaty "was probably between 85-90% of his pre-incident baseline by December 31, 2020."

¶14 After reviewing the medical panel's submissions and considering the evidence, the ALJ issued findings of fact, conclusions of law, and an order. In making that decision, the ALJ considered evidence from a number of sources, including the medical records, the medical panel reports (and addenda), and the opinions of the other medical professionals, including those of Treating Physician and Defense Expert 2 indicating that the work incident medically caused Beaty's need for lumbar spine surgery.

¶15 The ALJ relied on the medical panel's conclusions in part, explaining that the panel had "acknowledged that the industrial accident slightly altered the anatomy of" Beaty's pre-existing lower-back condition and had also "acknowledged that [Beaty's] pre-existing lumbar condition did not return to his pre-accident baseline." But the ALJ also explained that while the panel found some parts of the physical therapist's February 2021 examination significant, "a closer review" of that examination "show[ed] that [Beaty] could not safely perform the essential demands of his job," and the ALJ therefore found that Beaty "was not medically stable on December 31, 2020." The ALJ also pointed out that the medical panel's conclusion was based on Surgeon's recommendation for surgery *after* Beaty injured his back during the home incident. But the ALJ highlighted that Treating Physician had recommended surgery as early as August 2020—over a year before the home incident. The ALJ thus concluded that a "preponderance of the medical records shows that [Beaty] required surgery as a result of the . . . industrial accident."

¶16 After the ALJ issued her ruling, the Company asked the Labor Commission's Appeals Board (the Board) to review the ALJ's ruling. In its motion for review, the Company claimed, among other things, that the ALJ's decision was "inconsistent with the medical panel report" and that the ALJ "did not reject the

medical panel but instead alleged that [the ALJ's] opinions were supported by the panel," which, in the Company's view, was "not accurate." In turn, the Company argued that the ALJ "should have adopted" the opinions of the medical panel "or instead explained in detail why the opinions were being rejected."

¶17　The Board affirmed the ALJ's ruling, in relevant part, and concluded that Beaty's work accident medically caused a "permanent worsening of his pre-existing condition" and that "the surgery on his lumbar spine was necessary to treat such worsening." The Board explained that the medical panel's "reasoning . . . appear[ed] to misconstrue the evidence." Like the ALJ, the Board pointed specifically to the panel's failure to acknowledge that Beaty's performance evaluation in February 2021 showed that he "still lacked the strength and capacity to perform his job duties." The Board also pointed to Treating Physician's opinion, which drew "a medical causal connection" as early as August 2020 "between [Beaty's] work accident" and the "appropriate surgical treatment." The Board also rejected the Company's assertion that the home incident "was the medical cause of his need for surgery," because "there [was] no indication [that] such incident resulted in more than a minor 'pull' in his low[er] back." The Board expressly concluded that "[t]he opinions of [Defense Expert 2, Surgeon, and Physician Assistant] show that the lumbar spine surgery was necessary to treat [Beaty's] work-related injury." Thus, the Board affirmed the ALJ's ruling as to the lumbar spine surgery.

## ISSUE AND STANDARD OF REVIEW

¶18　The Company now challenges the Board's ruling regarding the lumbar spine surgery. Specifically, the Company claims that the Board's determination regarding medical causation was not supported by the evidence. "Whether the [Board] properly found that medical causation exists is a question of fact we review for substantial evidence." *YESCO v. Labor Comm'n*, 2021 UT App 96,

¶ 13, 497 P.3d 839. We discuss the parameters of the "substantial evidence" standard of review more thoroughly below, but in summary, this standard requires that "we defer to the agency if there is a quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Id.* (cleaned up).

ANALYSIS

¶19    The Utah Workers' Compensation Act governs the provision of benefits to workers injured in accidents "arising out of and in the course of" their employment. Utah Code § 34A-2-401(1). "[T]he language 'arising out of or in the course of employment' requires that there be a causal connection between the injury and the employment." *Allen v. Industrial Comm'n*, 729 P.2d 15, 18 (Utah 1986) (cleaned up). To demonstrate this connection, a claimant "must prove both legal causation and medical causation." *Cook v. Labor Comm'n*, 2013 UT App 286, ¶ 12, 317 P.3d 464. To establish medical causation, a "claimant must show by evidence, opinion, or otherwise that the stress, strain, or exertion required by his or her occupation led to the resulting injury or disability." *Id.* (cleaned up).

¶20    The Company challenges the Board's medical causation determination, arguing that it is not supported by substantial evidence and, specifically, that the Board erred in disregarding the medical panel's opinion that Beaty's work accident did not cause his need for lumbar spine surgery. The Company—as the proponent of judicial review—bears the burden of persuading us that no substantial evidence supports the Board's medical causation finding. *See C.R. England Inc. v. Labor Comm'n*, 2024 UT App 170, ¶ 28, 561 P.3d 213 ("[I]t falls to the . . . proponent of judicial review . . . to meet the burden of persuading us that no substantial evidence supports the [Board's] medical causation finding."), *cert. denied*, 564 P.3d 958 (Utah 2025). For the reasons discussed herein, we reject the Company's challenge. We begin by

discussing the legal standards governing both "substantial evidence" and "medical causation." We then address the merits of the Company's challenge.

¶21    The "substantial evidence" standard is the metric appellate courts use to evaluate the soundness of an administrative agency's factual findings, including determinations regarding medical causation. *See Provo City v. Utah Labor Comm'n*, 2015 UT 32, ¶ 8, 345 P.3d 1242 ("[A] challenge to an administrative agency's finding of fact is reviewed for substantial evidence."); *YESCO v. Labor Comm'n*, 2021 UT App 96, ¶ 13, 497 P.3d 839 (noting that an agency's determination that medical causation is present "is a question of fact we review for substantial evidence"). This standard is a deferential one: "in conducting a substantial evidence review, we do not reweigh the evidence and independently choose which inferences we find to be the most reasonable." *Provo City*, 2015 UT 32, ¶ 8 (cleaned up). "Instead, we defer to an administrative agency's findings because when reasonably conflicting views arise, it is the agency's province to draw inferences and resolve these conflicts." *Id.* (cleaned up); *see also YESCO*, 2021 UT App 96, ¶ 19 ("Merely pointing to conflicting facts and evidence is insufficient to undermine substantial evidence supporting the finding." (cleaned up)). Moreover, "substantial evidence" need not necessarily constitute a preponderance of the evidence—our supreme court has made clear that substantial evidence is "more than a mere scintilla of evidence though something less than the weight of the evidence." *Martinez v. Media-Paymaster Plus*, 2007 UT 42, ¶ 35, 164 P.3d 384 (cleaned up). In short, "a decision is supported by substantial evidence if there is a quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Provo City*, 2015 UT 32, ¶ 8 (cleaned up).

¶22    And our "medical causation" inquiry is similarly broad: a claimant need only "show that an industrial accident was a cause of the condition or injury requiring treatment." *See YESCO*, 2021 UT App 96, ¶ 15 (cleaned up); *see also Cox v. Labor Comm'n*, 2017

UT App 175, ¶ 18, 405 P.3d 863 (stating that a claimant "satisfies the medical causation standard" by "proving that the industrial accident is *a* cause—as opposed to *the* cause—of the condition requiring treatment"), *modified on other grounds by Morris v. Labor Comm'n*, 2021 UT App 131, 503 P.3d 519. After all, the purpose of the medical causation requirement "is to ensure that there is a medically demonstrable causal link between" the work-related incident and the employee's injuries. *Allen*, 729 P.2d at 27. Thus, "a correct formulation of this standard asks whether the industrial accident contributed to the employee's medical condition in any degree, such as by aggravating a preexisting condition, or . . . by aggravating other contributing non-industrial factors." *YESCO*, 2021 UT App 96, ¶ 15 (cleaned up).

¶23 We have previously held that a medical panel's determination as to medical causation—even standing alone and even when it conflicts with other evidence—can constitute "substantial evidence" to support the Board's medical causation determination. *See Hutchings v. Labor Comm'n*, 2016 UT App 160, ¶ 32, 378 P.3d 1273 ("[T]he medical panel's report *alone* provides substantial evidence to support the [Board's] medical causation determination." (emphasis added)); *see also Cook*, 2013 UT App 286, ¶¶ 14–20 (concluding that the medical panel's report constituted substantial evidence as to whether medical causation existed); Utah Code § 34A-2-601(2)(e)(i) (stating that an "administrative law judge may base" his or her "finding and decision on the report of . . . a medical panel").

¶24 For example, in *Cook*, the claimant contested the Board's medical causation finding by pointing to the opinion of two physicians indicating that her employer's refusal to allow her to "immediately seek medical care aggravated her cancer." 2013 UT App 286, ¶ 16. But the medical panel opined to the contrary, and we held that "the medical panel's report constitute[d] substantial evidence supporting the Board's determination that no medical causation existed." *Id.* ¶ 14. In so holding, we explained that while the claimant had "identified a possible conflict in the evidence, it

[was] the province of the Board, not appellate courts, to resolve conflicting evidence." *Id.* ¶ 19 (cleaned up). And in *Hutchings*, the claimant pointed to several pieces of evidence indicating that her industrial accident aggravated a pre-existing lower back condition, yet we still held that the medical panel's report—which conflicted with the other evidence upon which the claimant relied—"constitute[d] substantial evidence in its own right" and concluded that the Board's decision was "supported by substantial evidence in the whole record, including the medical panel's assessment." 2016 UT App 160, ¶¶ 31–32, 36, 38. When the Board follows a medical panel's admissible opinion in making a medical causation determination, that determination is supported by substantial evidence.

¶25 We now clarify that the opposite is also true: when the Board opts not to follow a medical panel's opinion in making a medical causation determination, but grounds that determination in other admissible evidence from health care providers or experts, that determination is also supported by substantial evidence. Indeed, the Board's "prerogative and duty is to consider not only the report of the medical panel, but also all of the other evidence and to draw whatever inferences and deductions fairly and reasonably could be derived therefrom." *Id.* ¶ 23 (cleaned up). The Board is not compelled to follow the opinions of the medical panel. *See* Utah Code § 34A-2-601(2)(e)(ii) (stating that "an administrative law judge is *not bound by* [a medical panel's report] if other substantial conflicting evidence in the case supports a contrary finding" (emphasis added)); *see also Ramos v. Cobblestone Centre*, 2020 UT 55, ¶ 31, 472 P.3d 910 (stating that administrative law judges "retain[] the discretion to reject the medical panel's recommendation"); *Hutchings*, 2016 UT App 160, ¶ 23 ("The [Board] is the ultimate finder of fact, even if a medical panel is convened." (cleaned up)). As we have explained, the role of the medical panel "is to evaluate medical evidence and advise an administrative law judge with respect to the . . . judge's ultimate fact-finding responsibility," but the factfinder "is not bound by

the panel's report." *Danny's Drywall v. Labor Comm'n*, 2014 UT App 277, ¶ 14, 339 P.3d 624 (cleaned up). Simply put, the Board "is neither bound to adopt the medical panel's report, nor is it obligated to base its findings and decisions on the report." *Hutchings*, 2016 UT App 160, ¶ 23.

¶26 Against this backdrop, it is clear that substantial evidence supported the Board's medical causation determination in this case. The ALJ and the Board both pointed to Treating Physician's opinion—reached as early as August 2020, soon after the accident—that the accident caused Beaty's need for lumbar spine surgery. The ALJ also relied on the Company's own expert, Defense Expert 2, who opined that the work accident was the medical cause of the worsening of Beaty's lumbar condition and the need for lumbar spine surgery. And on review, the Board expressly concluded that the opinion of Defense Expert 2—as well as the opinions of Surgeon and Physician Assistant—"show[ed] that the lumbar spine surgery was necessary to treat . . . Beaty's work-related injury." These medical opinions constitute substantial evidence justifying the Board's decision.

¶27 The Company argues that the Board misinterpreted Treating Physician's and Defense Expert 2's opinions and—if properly interpreted—these opinions could not constitute substantial evidence supporting the Board's decision.[1] Specifically, the Company argues that the medical panel correctly determined that Treating Physician's August 2020 report did *not* say that Beaty needed lumbar spine surgery on an industrial basis

---

1. The Company also argues that, for various reasons, Surgeon's and Physician Assistant's opinions do not constitute substantial evidence of medical causation. We disagree, but even assuming that the Company's arguments have merit, Treating Physician's and Defense Expert 2's opinions constitute substantial evidence in their own right to provide a basis for the Board's medical causation decision. Thus, we do not address the Company's arguments as to these other opinions.

at that time. That report noted that "Beaty has a documented work injury" and that "[h]e will require" surgery "for satisfactory long-term relief." As per the Company's interpretation of that report, Treating Physician "was not recommending surgery" and "did not explain whether the surgery would be for the work incident or the degenerative disc disease."

¶28   The Board adopted a different interpretation of Treating Physician's report, viewing that report as drawing "a medical causal connection" as early as August 2020 "between [Beaty's] work accident" and the "appropriate surgical treatment." In our view, both interpretations are reasonable, and we will not second guess the Board's judgment as the factfinder on this particular question because "in conducting a substantial evidence review, we do not . . . independently choose which inferences we find to be the most reasonable." *Provo City*, 2015 UT 32, ¶ 8 (cleaned up). Indeed, "where inconsistent inferences can be drawn from the same evidence, it is for the Board to draw the inferences," not the appellate courts. *Cook*, 2013 UT App 286, ¶ 19 (cleaned up).

¶29   As for Defense Expert 2, the Company argues that he never actually opined, to a "reasonable medical probability," that Beaty's need for surgery was medically caused by the accident. On this point, the Company emphasizes the language Defense Expert 2 used, and in particular these statements: "I *do feel* the medical evidence supports that [Beaty] had a work-related aggravation of his [pre-existing lower-back condition]," and "I *do feel* that the discectomy . . . performed by [Surgeon] . . . was likely due to the effects of his work injury." (Emphasis added.) The Company asserts, based on this language, that Defense Expert 2 was offering only his "feelings and thoughts" and was not actually offering a medical opinion.

¶30   We are unpersuaded by the Company's argument. The use of the word "likely" later in the same sentence is a good indication that Defense Expert 2 was offering an opinion based on a reasonable medical probability. But even more broadly, courts

have held that an expert's use of phrases like "I feel" or "I felt" do not serve to downgrade an opinion from a probability-based construct to a possibility-based construct. *See, e.g.*, *Vickers v. Jessup*, 629 A.2d 457, 460 (Conn. App. Ct. 1993) (stating that the preface "I felt" or "I suspected" did not render a surgeon's testimony lacking as to a "reasonable medical certainty" and explaining that the "use of certain colloquial phrases to begin a sentence does not move the surgeon's testimony into the realm of inadmissible speculation"). We see nothing erroneous in the Board's interpretation of and reliance upon the medical opinion offered by one of the Company's own retained experts.

¶31 The Board was not bound by the medical panel's report, including its finding that Beaty had become medically stable by December 2020. On this record, it was within the Board's discretion to reject the panel's report entirely and rely on other substantial evidence in the record. What's more, the Board explained why it was hesitant to rely on the panel's report. Specifically, the Board pointed out that the panel's "reasoning . . . appear[ed] to misconstrue the evidence" because the panel relied on parts of Beaty's February 2021 performance evaluation, which showed some progress in his functional capacity, yet the panel failed to acknowledge that the evaluation also showed that Beaty "still lacked the strength and capacity to perform his job duties." In short, the Board not only relied on substantial evidence supporting its decision, but it also took care to explain its reasons for rejecting the medical panel's opinions.

¶32 Under these circumstances, we cannot conclude that the Board's medical causation decision was unsupported by substantial evidence. Our case law is clear that the Board is not bound to follow the medical panel's findings and that the Board is the "ultimate finder of fact" in these cases. *See Hutchings*, 2016 UT App 160, ¶ 23. Accordingly, we reject the Company's challenge to the Board's determination that Beaty's work accident medically caused his need for lumbar spine surgery.

CONCLUSION

¶33    Substantial evidence exists, on this record, to support the Board's determination that Beaty's work accident medically caused the need for his lumbar spine surgery. The Board did not err by rejecting the medical panel's report and relying on other admissible evidence in the record. We therefore decline to disturb the Board's award of benefits to Beaty.

_____