2017 UT App 187

## THE UTAH COURT OF APPEALS

RAYMOND M. SNYDER,
Petitioner,

*v.*

LABOR COMMISSION; WESTERN CONSTRUCTION SPECIALTIES;
UTAH PROPERTY AND CASUALTY GUARANTY ASSOCIATION;
AND FREMONT INSURANCE GROUP,
Respondents.

Opinion
No. 20160822-CA
Filed October 13, 2017

Original Proceeding in this Court

Raymond M. Snyder, Petitioner Pro Se

S. Grace Acosta and Alisha Giles, Attorneys
for Respondent Utah Property and Casualty
Guaranty Association

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN and DAVID N. MORTENSEN concurred.

TOOMEY, Judge:

¶1      Petitioner Raymond M. Snyder seeks judicial review of
the Labor Commission's denial of his workers' compensation
claim for permanent partial disability (PPD) compensation. We
decline to disturb the Labor Commission's decision.

BACKGROUND

¶2    In 1999, Snyder worked for Western Construction Specialties (Western).[1] In July of that year, a hammer fell seventy feet and struck Snyder's "trapezius region" while he worked in an elevator shaft (the accident).[2] As a result, Snyder experienced shoulder and neck pain. After six days, Snyder continued to have shoulder and neck pain, and Western sent him to Work Care for an evaluation and x-rays. The x-rays did not reveal a fracture, and he was diagnosed with "strains and sprains of shoulder and upper arm" and a right shoulder contusion in the supraspinatus muscle—a muscle in the rotator cuff. Snyder told the physician that he had "no tenderness along the . . . right shoulder joint."

¶3    As a result of the injury, Snyder was placed on light duty for seven days because his employment as an iron worker consisted of repetitive, heavy, overhead lifting. He started attending physical therapy, which helped with the pain. In a follow-up appointment, Snyder "denie[d] any other signs and symptoms associated [with the accident]."

¶4    In October, after Snyder had returned to full duty, an MRI revealed a possible partial rotator cuff tear and a degenerative

---

1. In reviewing the Labor Commission's decision, we view the facts in the light most favorable to the Commission's findings. *See Fogleman v. Labor Comm'n*, 2015 UT App 294, ¶ 2 n.1, 364 P.3d 756.

2. At the time of the accident, Western was insured by Fremont Insurance Group, but Fremont entered bankruptcy and Utah Property and Casualty Guaranty Association assumed Fremont's accounts, including Snyder's account (collectively, Western and its insurers are referred to as UPCIGA).

cyst in his right shoulder indicative of "underlying arthritis." By December, Snyder's pain had increased, and he continued to complain of "pain across the base of the neck area across the trapezius to the superior shoulder area." Work Care's evaluation report stated he still had "full range of motion to the shoulder joint" and full strength. Snyder sought a second opinion from a physician (Physician), who found he had "limited [range of motion] in his neck." Physician told Snyder to begin a "neck stabilization rehab program." The reports of both Work Care and Physician focused on treating Snyder's neck pain, as this was his chief complaint, though Snyder commented that he "still ha[d] some [shoulder] pain with overhead motion."

¶5 In March 2000, Physician referred Snyder to a surgeon (Surgeon) to discuss treatment. A year and a half later, Snyder elected to have surgery to repair a possible partial rotator cuff tear and told Surgeon "he just went on a kayaking trip and felt that this may have aggravated [his shoulder pain]." His preoperative report indicated that there was "no evidence of acute fracture" and he had "mild degenerative changes" in his right shoulder joint. During surgery, Surgeon found the supraspinatus tendon was partially frayed but was intact. Surgeon and Physician each attributed the need for this surgery to the accident. UPCIGA paid for Snyder's shoulder surgery and subsequent physical therapy. Snyder also received PPD compensation.

¶6 In 2003, UPCIGA referred Snyder's medical records to a second physician (Second Physician) to determine whether the accident caused the rotator cuff injury that required surgery. Second Physician opined that it was "more probable than not that the surgery [was] related to degenerative work related condition[s] rather than the [accident]." UPCIGA then asked Surgeon to provide "information to determine [Snyder's] entitlement to future benefits." Surgeon informed UPCIGA that Snyder had reached medical stability and did not require

"further medical care . . . directly relate[d] to the [accident]." In this same document, Surgeon also stated that he prescribed medication for "long term treatment" of Snyder's arthritis.

¶7     Six years went by, and in late 2010, Surgeon assessed Snyder "with progression of degenerative arthritic changes in his right shoulder," leading Snyder to express concerns that "he would not be able to go on a rafting trip." By August 2011, Snyder's degenerative arthritis had progressed, and Surgeon recommended a total shoulder replacement surgery. But Snyder opted to postpone surgery because he had two more long rafting trips planned. In November 2012, Snyder finally had a total shoulder replacement. He was diagnosed with end-stage osteoarthritis and Surgeon opined that the accident medically caused the arthritis and the need for a shoulder replacement. UPCIGA paid for the surgery.

¶8     Two years after the total shoulder replacement surgery, Snyder had an impairment rating evaluation and was informed that he qualified for an "11% whole person" impairment rating.[3] In 2014, Snyder applied for PPD compensation for his 11% whole person impairment rating that resulted from his degenerative arthritis. At UPCIGA's request, a third physician (Third Physician) performed a medical examination to determine whether the accident caused Snyder's arthritis. Third Physician opined that the degeneration in Snyder's shoulder was a result of "chronic use" which was consistent with a "gentleman [at this] age working heavy overhead activity all of those years developing rotator cuff disease."

---

3. The treating physician who provided this rating explained that "[a]n impairment rating is the measurement of the residual deficits that remain[] because of the injury or event, after an injured worker reaches medical stability."

¶9     Snyder received an initial hearing on his application for PPD compensation. The administrative law judge (the ALJ) referred the joint medical records exhibit (the MRE) to a medical panel to resolve the dispute as to the medical cause of Snyder's degenerative arthritis. An occupational-medicine expert and an orthopedic surgeon comprised the medical panel. It reviewed Snyder's "relevant medical history and examined him before concluding that the accident did not medically cause the current degenerative arthritis in his right shoulder." The medical panel drafted a report supporting its conclusion.

¶10     The ALJ denied Snyder's request for PPD compensation based on the medical panel's determination that the accident did not cause his degenerative arthritis. The Labor Commission affirmed the ALJ's decision. Snyder now seeks judicial review of the Labor Commission's denial of his request for PPD compensation.


ISSUES AND STANDARD OF REVIEW

¶11     Snyder contends there was insufficient evidence for the Labor Commission to conclude that his shoulder injury was not the result of the accident. "We will not disturb the Commission's factual finding unless the party challenging the findings demonstrates that a finding is not supported by substantial evidence." *Hutchings v. Labor Comm'n*, 2016 UT App 160, ¶ 23, 378 P.3d 1273; *accord* Utah Code Ann. § 63G-4-403(4)(g) (LexisNexis 2016) ("The appellate court shall grant relief only if . . . a person seeking judicial review has been substantially prejudiced by . . . [an] agency action [that] is based upon a determination of fact, made or implied by the agency, that is not supported by substantial evidence[.]").

ANALYSIS

I. Inadequate Briefing

¶12    As we understand it, Snyder makes six contentions.[4] He contends the Labor Commission erred (1) in denying his "request for hearing on underpaid benefits"; (2) in denying his request for a hearing related to his "being removed from a suit between insurers"; (3) "in adopting the medical panel report"; (4) in adopting the factual findings that decades of rowing activities contributed to his arthritis; (5) "in holding [him] to the same standard as a qualified member of the [Utah State Bar]"; and (6) in denying him PPD compensation.

¶13    With respect to the first five claims, Snyder "failed to develop his citation to authority, and failed to provide any reasoned analysis based on that authority." *See State v. MacNeill*, 2017 UT App 48, ¶ 84, 397 P.3d 626; *see also State v. Roberts*, 2015 UT 24, ¶ 18, 345 P.3d 1226 (explaining that "our adequate briefing requirement . . . is a natural extension of an appellant's burden of persuasion" (citation and internal quotation marks omitted)). Under rule 24(a)(9) of the Utah Rules of Appellate Procedure, an appellant's brief is required to "contain the contentions and reasons of the appellant with respect to the issues presented . . . with citations to the authorities, statutes, and parts of the record relied on." An issue is inadequately briefed if "the argument merely contains bald citations to authority [without] development of that authority and reasoned analysis based on that authority." *Bank of America v. Adamson*, 2017 UT 2, ¶ 11, 391 P.3d 196 (alteration in original) (citation and internal quotations marks omitted). While inadequate briefing is

_____

4. Snyder identified several issues for judicial review but failed to address each of these in the argument section of his brief and made arguments that he did not specifically identify as issues.

no longer "an absolute bar to review of an argument on appeal," a party that "fails to adequately brief an issue will almost certainly fail to carry its burden of persuasion on appeal." *Rose v. Office of Prof'l Conduct*, 2017 UT 50, ¶ 64 (citations and internal quotation marks omitted). We have attempted to articulate and respond to the substance of his contentions, *see id.* ¶ 66, but ultimately we conclude Snyder failed to carry his burden of persuasion on appeal, *id.* ¶ 64, and we therefore decline to disturb the Labor Commission's order with respect to his claims.

A.    Denial of Request for Hearing on Underpaid Benefits

¶14    Snyder contends the Labor Commission erred in affirming the ALJ's denial of his application for hearing on underpaid benefits. He asserts that at the May 2015 hearing on his application for PPD compensation the ALJ "advised Snyder it would be . . . 'wise' to file another application for [a] hearing" to address the claim that he may have been underpaid benefits. Snyder did not file an application for hearing regarding the underpaid benefits until nine months later in February 2016. His application was "treated as a request to amend [his] current application for [a] hearing" because it "relate[d] to the same injury" and was denied as untimely filed. Snyder argues that the Labor Commission abused its discretion when it affirmed this denial but does not provide any legal authority to support this argument or develop any reasoning that the February 2016 application should not be treated as a request to amend his current application. We conclude Snyder has not met his burden of persuasion on this issue and decline to disturb the Labor Commission's decision with respect to this claim.

B.    Denial of Request for Hearing Regarding Subrogation Lawsuit

¶15    Snyder contends that because he was "advised that neither the Labor Commission nor the Appeals Board has

jurisdiction to adjudicate his allegations of contract fraud" at issue in the subrogation lawsuit between insurers, the Labor Commission left "the issue to be decided by this court." Snyder failed to provide us with any legal authority that would give us jurisdiction to review a claim that was not developed below. We have appellate jurisdiction over "a final order or decree resulting from . . . a formal adjudicative proceeding of a state agency." Utah Code Ann. § 78A-4-103(2)(a)(i)(A). Black's Law Dictionary defines "appellate jurisdiction" as the "power of a court to review and revise a lower court's decision." *Appellate Jurisdiction*, Black's Law Dictionary (9th ed. 2009). Thus, our jurisdiction is limited to reviewing and revising claims adjudicated in the lower court or agency proceedings. Because Snyder has not challenged the Labor Commission's conclusion that it did not have jurisdiction to review his claim of contract fraud, *see Barnhart v. Labor Comm'n*, 2011 UT App 87, ¶ 2, 250 P.3d 1015 (per curiam) (concluding that Barnhart "waived" the issue of whether his claims "were not within the Labor Commission's jurisdiction" because his objections were "not raised in the agency proceeding"), and because he has not suggested an exception to our rule that courts should not reach issues on review that were not developed below, *see Brown & Root Industry Service v. Industrial Comm'n of Utah*, 947 P.2d 671, 677 (Utah 1997), we conclude Snyder has not met his burden of persuasion and dispose of this issue as inadequately briefed.

C.    The Medical Panel's Report

¶16    Snyder contends the Labor Commission erred in adopting the medical panel's report, alleging first that it was "incomplete, factually erroneous . . . and included evidence fabricated by [UPCIGA]." He notes that the MRE was incomplete because it did not include the images of his x-rays. Although this is true, the record included the radiologists' findings for each of Snyder's x-rays. Snyder does not explain why the medical panel would need the x-ray images for its evaluation or why it should

not have relied on the radiologists' findings. In addition, Snyder did not provide the x-ray images for inclusion in the joint MRE.

¶17   Second, Snyder alleges that UPCIGA "committed fraud by fabricating a profile to explain Snyder's shoulder issues . . . with the intent to have benefits due [to] Snyder denied." Snyder recounts in detail his disagreement with the opinions of the physicians that conducted medical examinations. To be sure, the doctors disagreed about whether Snyder's degenerative arthritis was the result of the accident, and because of this, the ALJ sent the medical records to a medical panel for evaluation. *See* Utah Admin. Code R602-2-2(A)(1) ("A [medical] panel will be utilized by the Administrative Law Judge where one or more significant medical issues may be involved. Generally a significant medical issue must be shown by conflicting medical reports . . . [such as] [c]onflicting medical opinions related to causation of the injury or disease[.]") But Snyder does not point us to anything in the record—and we have found nothing in our review of it—that supports his allegations of "fraud"[5] or "fabrication." We conclude that Snyder's bare allegations of fraud and fabrication are insufficient to carry his burden of persuasion, and we decline to disturb the Labor Commission's decision with respect to this argument.

D.    Decades of Rowing Activities

¶18   Snyder contends the Labor Commission "erred in allowing fabricated statements by ALJs . . . into the record, as testimony, adding a contrived cause for Snyder's right-shoulder condition," i.e., kayaking. Snyder takes issue with the language of an interim order by the ALJ. He claims the evidence was

---

5. Snyder provides case law that defines "fraud" but does not provide examples of it in his case, nor does he compare or distinguish the facts of his case from the cited case law.

"manufactured," "nowhere in the record," and the medical panel found kayaking "could only cause shoulder discomfort." These claims incorrectly characterize the record.

¶19 The Interim Order adopted language from the medical panel report and the MRE that his kayaking activities aggravated the pre-existing degeneration in his shoulder. There is ample evidence in the record that contradicts Snyder's contention that the ALJ fabricated evidence that his kayaking and rowing activities contributed to his degenerative arthritis and thus independently created a new cause of the arthritis. Snyder has not provided any legal authority to suggest that adopting the statements from the MRE or the medical panel report was an abuse of discretion. We conclude Snyder has not met his burden of persuasion on this issue and decline to disturb the Labor Commission's decision with respect to this claim.

E.     Holding Snyder to the Same Standard as a Member of the Utah State Bar

¶20 Snyder contends the Labor Commission erred in holding him to the same standard as a qualified member of the Utah State Bar when it affirmed the ALJ's refusal to read more than five pages of his ten-page, single-spaced Objection to the Medical Panel Report (Objection). Snyder argues that because the first seven pages of his Objection were facts, the tribunal never reviewed his arguments.

¶21 Under Utah Administrative Code R602-2-2(B)(2), "[o]bjections shall not exceed 10 pages" and "shall be double spaced." Snyder has failed to provide us with an explanation as to how his argument could have influenced the ALJ to refuse to consider the medical panel report. Instead, Snyder merely asserts that refusing to review the entire ten-page, single-spaced Objection was an error.

¶22 We have reviewed all ten pages of his Objection and see nothing in the remaining five pages that would have provided the ALJ with a basis to refuse to consider the medical panel report when determining whether Snyder was entitled to PPD compensation. Instead, Snyder's Objection consisted of the same "bald citations to authority [without] development of that authority and reasoned analysis based on that authority[,]" *see Bank of America*, 2017 UT 2, ¶ 11 (citation and internal quotations marks omitted), that he included in his briefing before this court. We conclude he has not met his burden of persuasion on this issue and decline to disturb the Labor Commission's decision with respect to this contention.

¶23 Ultimately, we conclude that Snyder's inadequate briefing resulted in a failure to meet his burden of persuasion and decline to disturb the Labor Commission's decision with respect to these five contentions.

## II. Sufficiency of the Evidence

¶24 Finally, Snyder contends there was insufficient evidence to establish that his degenerative arthritis was not a result of the accident. For this court to reverse, Snyder must show that the findings of the causation of his injury "[are] not supported by substantial evidence." *Hutchings v. Labor Comm'n*, 2016 UT App 160, ¶ 23, 378 P.3d 1273. "Substantial evidence is more than a mere scintilla of evidence . . . though something less than the weight of the evidence, and the substantial evidence test is met when a reasonable mind might accept as adequate the evidence supporting the decision." *Id.* ¶ 30.

¶25 Snyder sought PPD compensation for the "permanent impairment caused by [the] industrial accident." *See* Utah Code Ann. § 34A-2-412(6)(a) (LexisNexis 2015). "[P]ermanent partial disability compensation shall be awarded by the commission based on the medical evidence." *Id.*

¶26    To qualify for PPD compensation, "the claimant must demonstrate (1) that the injury occurred 'by accident' and (2) that the conditions and activities of the job were the cause of the injury." *See Hutchings*, 2016 UT App 160, ¶ 16 (citing *Allen v. Industrial Comm'n*, 729 P.2d 15, 18 (Utah 1986)); *accord* Utah Code Ann. § 34A-2-401 (LexisNexis 2015). "The key causation question is whether, given this body and this exertion, the exertion in fact contributed to the injury." *See Hutchings*, 2016 UT App 160, ¶ 16 (citation and internal quotation marks omitted). The claimant must show that this exertion was "both the legal cause and the medical cause of the injury or disability." *Id.*

¶27    To support a showing of legal cause, an employee's "usual or ordinary exertion, so long as it is an activity connected with the employee's duties, will suffice[.]" *Price River Coal Co. v. Industrial Comm'n of Utah*, 731 P.2d 1079, 1082 (Utah 1986). Here, the Labor Commission affirmed the ALJ's determination that "a hammer falling several stories and striking [Snyder] on the shoulder [was] an activity that satisfie[d] the legal causation standard." Thus, legal causation is not at issue.

¶28    As to medical causation, "[u]nder the medical cause test, the claimant must show by evidence, opinion, or otherwise that the stress, strain, or exertion required by his or her occupation led to the resulting injury or disability." *Allen*, 729 P.2d at 27. Because workers' compensation claims require the determination of medical causation, "the importance of the . . . medical panel becomes manifest." *Id.* (omission in original) (citation and internal quotation marks omitted). "It is through the expertise of the medical panel that the Commission should be able to make the determination of whether the injury sustained by a claimant is causally connected . . . [to] the claimant's employment." *Id.* Absent a showing of "a medical causal connection, compensation should be denied." *Id.*

¶29    In this case, the ALJ referred Snyder's medical records to the medical panel to determine whether the hammer falling and striking Snyder's shoulder was the medical cause of his degenerative arthritis. Under the Utah Administrative Code R602-2-2(A)(1), a medical panel "will be utilized by the Administrative Law Judge where one or more significant medical issues may be involved. Generally a significant medical issue must be shown by conflicting medical reports . . . [such as] [c]onflicting medical opinions related to causation of the injury or disease[.]" Here, Surgeon's medical opinion regarding causation conflicted with the medical opinions of Second Physician and Third Physician, and thus the need for a "medical panel [became] manifest." *See Allen*, 729 P.2d at 27. Surgeon attributed Snyder's degenerative arthritis to the accident. On the other hand, Second Physician and Third Physician each opined that his degenerative arthritis was consistent with an elderly man who worked in the iron industry for an extended period of time with consistent, heavy, overhead work.

¶30    The medical panel reviewed all of Snyder's medical records related to his shoulder injury dating back to the accident and determined that the accident was not the medical cause of Snyder's degenerative arthritis. The medical panel found that the "mechanism of injury simply [was] not consistent with the objective pathological findings in the right shoulder." There was "no evidence of sufficient traumatic exposure, with the [accident] to the shoulder joint, to cause the degenerative changes noted at [the first] surgery." Rather, the "type and degree of degenerative arthritis noted at his [first] surgery" progress slowly over time and "would be more consistent with heavy shoulder activity," such as "decades [of work] as an iron and steel worker," which is "well known" to "cause substantial shoulder problems over time and lead to impingement," "wear and tear," and degenerative arthritis. In addition, the medical panel found that his kayaking trips "aggravated his shoulder pain" and that "[k]ayaking, raft rowing and similar activities are

known triggers for significant shoulder discomfort." Ultimately, the medical panel concluded that Snyder's degenerative arthritis was "due to factors other than the hammer incident."

¶31  Substantial evidence supported the medical panel's finding that the accident was not the medical cause of Snyder's arthritis. *See Hutchings*, 2016 UT App 160, ¶ 23. The medical panel found that the degree of degenerative changes in Snyder's shoulder discovered during his first surgery in 2001 "indicate[d] longstanding, severe, age and activity related degenerative arthritis." The medical panel supported its findings by discussing other factors that contributed to Snyder's arthritis. Snyder worked in the iron and steel industries for several decades and his responsibilities involved extensive heavy, overhead activity. And, although Snyder contests this finding throughout his brief, there is substantial evidence to support that his kayaking and rowing activities were factors that contributed to his current diagnosis. His medical records reflect that at nearly every appointment a physician would comment on his passion for kayaking. And on at least two occasions, Snyder informed the physician that a kayaking trip either "aggravated" his shoulder pain or "stirred up the shoulder significantly." Snyder also postponed a complete shoulder replacement surgery for over one year because "he ha[d] two more long rafting trips that he want[ed] to get over and done with before he ha[d] any further surgery." Surgeon agreed to postpone the surgery because he thought Snyder "would be pushing it a little bit to think he [could] row the Grand Canyon just four months after a total shoulder [replacement and] would be a bit concerned given the vigorous nature of this activity."

¶32  Although Surgeon opined in 2014 that Snyder's "pain had been progressive in nature and had worsened over time all due to his original work injury to his shoulder," there was substantial evidence that supported the medical panel's determination that the accident was not the medical cause of his

degenerative arthritis. The Labor Commission found that the minimal evidence that suggested the accident was the medical cause of Snyder's degenerative arthritis "[was] countered by the preponderance of the evidence." We agree and thus decline to disturb the Labor Commission's denial of Snyder's request for PPD compensation.

## CONCLUSION

¶33    We conclude there was substantial evidence to support the Labor Commission's determination that the accident did not cause Snyder's degenerative arthritis and we therefore decline to disturb the Labor Commission's denial of Snyder's PPD compensation.

_____